56 CCPA

**William S. GUBELMANN, Deceased, by Walter S. Gubelmann, Executor, Appellant,**

v.

**Herman GANG, Appellee.**

**Patent Appeal No. 8105.**

United States Court of Customs and Patent Appeals.

April 3, 1969.

ence No. 94,638 to Herman Gang, the junior party.

Gubelmann is involved on application serial No. 168,595, filed January 22, 1962, a "continuation" of application serial No. 69,227, filed November 14, 1960, which in turn was a "division" of application serial No. 194,273, filed November 6, 1950, and now patent No. 2,969,177. The benefit of the filing date of the latter application was accorded Gubelmann by the examiner. In issue are two counts copied from U. S. Patent No. 3,102,688, granted to the junior party, Gang, on an application filed February 2, 1960.

The invention relates to tens transfer or "carry" mechanisms for calculating machines, of the type known as "simultaneous" tens transfer mechanism. The counts read: [1]

1. In a register including an ordinal series of register wheels, a reciprocatory transfer actuator for each wheel, a common reciprocatory drive means for said actuators, normally disabled connecting means adjustable upon movement of each wheel from a first to a second given registering position to connect the actuator of the next higher order wheel to said drive means for a forward stroke in a primary transfer operation, *said drive means thereupon being operable in a return stroke to restore said actuator independently of said connecting means,* normally disabled drive transmission means between each pair of adjacent actuators operable during the forward stroke of operation of the lower order actuator of said pair to transmit like movement to the higher order actuator of said pair in a secondary transfer operation, *said actuator drive means thereupon being operable to restore said pair of actuators simultaneously and each independently in a return stroke,* and means operable

Burgess, Ryan & Hicks, New York City (John F. Ryan, New York City, of counsel), for appellant.

Norman Friedman, Morristown, N. J., for appellee.

Before WORLEY, Chief Judge, and RICH, ALMOND and BALDWIN, Judges.

ALMOND, Judge.

William S. Gubelmann appeals from the decision of the Board of Patent Interferences awarding priority of invention of the subject matter of Interfer-

---

1. Emphasis is supplied to designate the recitations principally involved here.

when each wheel is in said first given registering position to enable the drive transmission means between its actuator and the actuator of the next higher order wheel.

2. In a register including an ordinal series of register wheels, a reciprocatory transfer actuator for each wheel, *a common reciprocatory drive means for said actuators normally ineffectively operable in its forward stroke and normally operable in its return stroke to return all of said actuators simultaneously and each independently from their forward stroke position,* normally disconnected coupling means for connecting each actuator to said drive means for forward stroke operation therewith in a primary transfer operation, means operable upon movement of each wheel from a first to a second given registering position to connect the coupling means for the actuator of the next higher order wheel, normally disabled drive transmission means operable by each actuator in its forward stroke to impart forward stroke secondary transfer operation to the next higher order actuator, and means operable when each wheel is in said first given registering position to enable the drive transmission means to the actuator of the next higher order wheel.

The sole issue raised by this appeal is whether the disclosure of Gubelmann supports certain limitations in the count or, stated briefly, Gubelmann's "right to make."

It is Gang's contention that Gubelmann cannot support the following limitations: (1) a drive means operable in its return stroke to restore the actuator (counts 1 and 2); (2) a drive means operable to restore the actuator independently of the connecting means (count 1). In his brief before this court Gang additionally contended, for the first time, that Gubelmann failed to support the counts "because there is no primary tens transfer between any orders of the mechanism Gubelmann is relying on." We agree with Gang as to Gubelmann's lack of support for the first limitation set forth above, and thus need not consider the other reasons raised by appellee.[2]

Procedurally, this appeal comes to this court with this history. The interference was originally declared on the basis of count 1. Gang alleged no date prior to the effective filing date of Gubelmann and, accordingly, was placed under order to show cause why judgment should not be entered against him. Gang responded by moving to dissolve on the ground that the count is not supported by Gubelmann's disclosure. Gubelmann filed two motions to amend by adding proposed counts 2–5 and 6. Both motions were opposed by Gang on the ground and for reasons similar to those advanced in his motion to dissolve. The primary examiner denied Gang's motion to dissolve and granted Gubelmann's motion to amend as to proposed count 2. Gang thereupon requested that final hearing be set for consideration of the question of Gubelmann's right to make counts 1 and 2 and that request was granted. The Board of Patent Interferences held that Gubelmann had failed to establish his right to make the counts and awarded priority to Gang.

The counts in issue define an invention which constitutes only a small portion of a relatively complex mechanism. However, a description of the specific

2. In view of the new point raised in Gang's brief, appellant Gubelmann moved for, and was granted, leave to file a reply brief. Appellee, in response to the reply brief, moved to strike certain portions as going beyond the new point raised in his brief. The court denied this motion without prejudice to renewal at the time of oral argument. Appellee renewed the motion to strike at oral argument; however, the view we take of the case renders consideration of the merits of the motion unnecessary and accordingly appellee's motion to strike is dismissed.

structures relating to the counts will suffice for our consideration of the issue before us. First, an understanding of what is meant by the terms "primary" and "secondary" transfer is helpful. A primary tens transfer operation is one in which a tens transfer is caused by addition of a value into a register wheel through the usual value entry means such as differentially settable actuator gears. For example, the wheel stands at "8" and the value of "3" is added, causing a tens transfer of 1 into the order to the left. A secondary transfer is one in which a tens transfer is caused by a tens transfer from the adjacent lower order. For example, three adjacent orders of the register wheels register the value "998," and a value of "3" is added to the first, or lowest, order. The "3" added to "8" causes a primary tens transfer into the second order. This primary transfer of a value of 1 into this order will cause its register wheel to go from 9 to 0, which will cause a tens transfer into the third order. The latter wheel will go from "9" to "0," causing a tens transfer into the fourth order. The latter two transfers are secondary transfers, since they were caused by a tens transfer from the next lower order. A simultaneous tens transfer mechanism is one in which the primary and all resulting secondary transfers occur simultaneously.

The pertinent portion of the Gang device is shown in Fig. 3:

FIG.3

Gang's primary tens transfer mechanism is adequately described in Gubelmann's brief as follows:

[A] series of reciprocatory tens transfer actuator gear segments 10 are associated with an ordinal series of register wheel gears 6. Normally, actuators 10 are in the counterclockwise position of Fig. 3 to which they are restored by a common reciprocatory drive means comprising a bail 14 which extends transversely of the actuators above arms 10a of said actuators. Bail 14 is reciprocated, subsequent to digital registration, clockwise in a forward stroke and then returned counterclockwise in a return stroke.

An upstanding link 19 is pivotally mounted at its lower end to the end of arm 10a of each transfer gear

segment 10. Normally link 19 is in the counterclockwise position of Fig. 3 with a hook end 19a out of the path of drive bail 14. Thus, in a sequence of operation, the bail is normally reciprocated without affecting the link or the actuator. In other words, the bail is normally reciprocating ineffectively.

When a register wheel passes through "9" in additive digital registration, link 19 of the next higher order transfer actuator 10 will be rocked clockwise to bring its hook end 19a above and into the path of bail 14 thereby connecting the actuator with the bail. Therefore, when bail 14 is rocked clockwise in its forward stroke, the connected transfer actuator 10 will be likewise rocked * * *. During this forward stroke, the related wheel gear 6 will remain disengaged and therefore transfer gear 10 will be idly operated in a primary transfer operation.

After the above forward stroke of the parts, gear 6 will be engaged with transfer actuator 10. Then during the return stroke movement of bail 14, its lower edge will engage arm 10a of transfer segment 10 thereby restoring said segment counterclockwise and entering one unit into the engaged wheel gear 6 in a primary transfer * * *. Drive bail 14 restores the actuator 10 and the connected hook link 19 counterclockwise about shaft 11 to normal position without any particular dependence upon the hook link 19. However, it should be noted that hook link 19 (connecting means) is restored counterclockwise about shaft 11 together with the connected actuator 10. Thereafter his shaft 21 must be rotated in a separate operation of the

sequence to normalize the member 16 for shifting the hook link 19 counterclockwise about its own pivot and for thus disengaging the hook link 19 from the drive bail 14 to complete restoration of the hook link 19 to the position shown in Fig. 3.

One or more secondary transfers are performed simultaneously with a primary transfer as follows: Referring to Fig. 3, each tens transfer actuator 10 has an upstanding link 25 pivotally mounted at its lower end to a right arm 10b of said actuator. A pin 27 in arm 10b extends toward the next higher order actuator to the plane of link 25 of said higher order.

Consider an adjacent pair of actuators 10. If the register wheel of the lower order actuator stands at a value of "9," link 25 of the higher order actuator will be rocked counterclockwise from the position of Fig. 3. This will position a nose 25a of link 25 beneath pin 27 of the lower order actuator. Therefore, if the lower order actuator is rocked clockwise by bail 14 in a primary transfer operation, pin 27 of said actuator will engage nose 25a of link 25 of the higher order actuator; and will simultaneously rock said higher order actuator clockwise in a secondary transfer operation. Thus, each successive higher order actuator may be entrained for clockwise movement with the next lower order actuator.

The portion of the foregoing Gang structure which is pertinent to the issue of Gubelmann's right to make is recited in the limitation singled out for consideration as follows:

drive means [bail 14] * * * operable in a return stroke to restore said actuator [segment 10] * * *.

Gubelmann's structure is illustrated in Figs. 29 and 30 as well as Fig. 124 of the parent patent:

FIG.29    FIG.30

A plurality of gears 221 (Fig. 30) for the various orders are each meshed with corresponding number wheels (not shown). Means for rotating gears 221 comprise, for each gear, a drive pawl 371 (Fig. 30) pivotally mounted on an arm of a member 367 (Fig. 30) which is pivotally mounted on shaft 364. Member 367 is coupled to a lever 363 which is pivotally mounted adjacent its lower end on shaft 364. Member 367 is blocked from rotation in a clockwise direction relative to lever 363 when the parts are in the position shown by lateral lug 368 (Fig. 30) which extends from lever 363 to the outer end of the upper arm of member 367. Torsion spring 369 maintains that arm of member 367 in contact with lateral lug 368 as lever 363 rotates on shaft 364, until such time as a depending arm of the member strikes sleeved shaft 370.

Drive pawl 371 can be swung into position, depending upon the position of

rod 375. Clockwise rotation of member 367 will cause either lug 372 or lug 373 to strike and rotate gear 221, the direction of rotation depending upon which lug first makes contact. This motion adds or subtracts a digit in the number wheel. The object of the structure concerned in this interference is to control the motion of member 367 so as to achieve a clockwise registration stroke at appropriate times followed by a counterclockwise restoration or return stroke. This is done by controlling similar motions on the part of lever 363, to which member 367 is effectively coupled by lug 368 and biasing spring 369. A spring 365 biases lever 363 in a counterclockwise direction to normally abut stop rod 366 as shown in Fig. 29.

During each cycle of the machine, a drive means actuating rod 398 (Fig. 29), transverse all orders of levers 363, is reciprocated once, first clockwise, then counterclockwise. During its reciprocation the rod moves from the raised position, as shown in Fig. 29, to a middle or "hook engaging position" as seen (designated 867) in Fig. 124. After pausing in this position, rod 398 drops further to an "operated position." The cycle is completed by rod 398 rising to the "return position."

Hook 396 is pivotally attached to the middle of lever 363. A tension spring exerts a torque on hook 396, constantly tending to rotate the hook clockwise about its pivotal connection with lever 363. When rod 398 is in the uppermost "return position," this torque is overcome by the camming action of the rod on the adjacent edge face of hook 396 and the hook assumes the counterclockwise position shown in Fig. 29. As a cycle of operation begins, rod 398 drops to a generally central position in its slot 430 (Fig. 29), as indicated (designated 901) in Fig. 124, while spring 365 in each order holds its respective lever 363 in normal position. In this central position of the rod, the registration operations of the machine occur and, at this time, a detent 401 (Fig. 29) may be swung clockwise to disengage it from hook 396 and permit the hook to engage rod 398 under tension of the spring. Normally, as rod 398 descends, lug 399 will latch onto or hang-up on lug 400 of detent 401. In this condition no part of hook 396 can thereafter engage actuating rod 398 as the rod continues its descent, and lever 363, member 367 and drive pawl 371 will remain unmoved during the remainder of the new stroke. The drive means thus normally operates ineffectively in its forward stroke.

If, however, the dial in the next lower order to that being discussed passes through a "tens carry" position, as from 9 to 0, while rod 398 is in the hook-engaging position, detent 401 in the order being discussed will be rotated clockwise before rod 398 descends to the operated position. That rotation of detent 401 frees hook 396 and allows it to rotate in a clockwise direction from the position shown in Fig. 29 so that the ledge or nose adjacent its lower end can engage below actuating rod 398. If hook 396 so engages the rod as just described, the hook, lever 363, member 367 and drive pawl 371 will all be pulled downward in a clockwise direction into the operated position, achieving a "primary transfer operation."

The forward stroke having been achieved, the various parts of the device are restored as rod 398 rises to the returned position. Prior to completion of this restoration motion, detent 401 will have swung counterclockwise to its normal position. As hook 396 rises, however, lug 399 thereon will contact the lower edge of lug 400 on detent 401, and will push the detent aside sufficiently to allow hook 396 to pass. Once the hook has passed the detent, the latter will snap counterclockwise under the influence of torsion spring 402, thus passing under lug 399 on the hook and into position to block its clockwise rotation during the next cycle.

The action of rod 398 in pulling down hook 396 of what is termed in Gubel-

mann "the first outboard order" constitutes a primary transfer operation. The rotation of outboard orders which are higher than the first outboard order is a *secondary transfer operation and is not accomplished* by the hooks 396 associated with the higher orders. Instead each lever 363 is equipped with a mechanism at its upper end which temporarily connects it to lever 363 of the next higher operating order when carry is required. When such connections have been ·established, clockwise rotation of lever 363 of the first outboard order during a primary transfer operation will result in similar rotation of all the levers 363 of the higher outboard orders which are coupled, either directly or indirectly, to the lever of the first outboard order. Whether or not adjacent levers will be coupled together is determined by the position of the number wheel corresponding to the lower order of the two.

The above accounts of the structure and operation of the mechanisms do not appear to be subject to controversy. The issue develops as we consider the decisions below.

In reply to Gang's motion to dissolve, the primary examiner stated:

> The terms of the claims are not strained at all by reading the "drive means" on Gubelmann's bail 398. This bail is operated in a forward and return stroke, and it is operable in the latter in order to restore (cause restoration, permit restoration) of the individual carry actuators; the language of the claim does not require restoration by direct engagement (and pushing) with the actuators; it is satisfied by the freeing of the actuators for restoration by springs 365 when bail 398 is restored.

The board took a different view, interpreting first the language "drive means * * * operable in a return stroke to *restore said actuator*"; it found it free of ambiguity, stating:

> It is clear and plain; it requires the "drive means" to *perform* two specified

functions, that means and no other. One function it is required to *perform*, not merely *permit* the performance of, is to "restore" or to "return" the "actuator" to its former, normal position.

Turning to Gubelmann's disclosure, the board found that

> * * * nowhere in his disclosure did Gubelmann specifically disclose or contemplate that the same rod 398 would perform any restoring or returning function on lever 363 and its associated connected elements beyond cooperating with the curved surface 406 on hook 396 to effect the disengagement of the nose of that hook from the rod 398 and the relatching of that hook by detent 401. * * * His only *specific* disclosure is directly to the contrary, irrespective of how the structure *might* operate. Indeed, Gubelmann has pointed to only one place on his specification * * * for any support for his position and then refers only to the *holding* function of a *"return* spring 365" with respect to the noted lever 363 and associated connected elements.

> *       ·*       *       *       *

> We believe that Gubelmann designated spring 365 a "return" spring because that is what he intended· it to be and because that is what it is. It is the *only* element specifically designated as a "return" element that cooperates with the lever 363 and connected elements to restore or return the actuating means to its former, normal position after a transfer operation. The "return spring 365" is the only element that positively effects a function in the "restore" or "return" operation.

> To the contrary, the rod 398, i. e. the "drive means", at most apparently effects only a control function in limiting the rate at which the lever 363 and associated elements are *permitted* to be restored or returned to their initial position. Thus, the hook 396

*prevents* the return of the lever 363 at a faster rate than it is moving itself. This we do not regard as effecting a restoring or returning function.

The board concluded by holding that real doubt existed as to Gubelmann's right to make the counts and that it would require an unreasonable straining of the language of the counts in order to find support therefor in Gubelmann's disclosure.

■ The examiner's reasoning requires the conclusion that the count language in question, "operable in a return stroke to restore," defines something less than affirmative action. We disagree. While not unmindful of the rule that a copied claim forming a count in an interference must be given the broadest construction which its language will reasonably permit, we agree with the board that the above-quoted language clearly requires that the drive means act positively in its return stroke to perform the stated function of restoring the actuator. It would be unreasonable to read into the unequivocal count language the limitation "permit or allow restoration" in place of simple term "restore." Were we to adopt appellant's broad construction of the language, the count then can cover both Gang and Gubelmann only by giving it the affirmative meaning when applied to Gang and the different, "permissive" meaning when applied to Gubelmann. This is ambiguity and resort to the specification of the patent in which the count originated as a claim to ascertain its meaning would be proper. Such reference here would merely reinforce our finding above.

■■ Turning to a consideration of appellant's disclosed device, we repeat the rules applicable to such an interference proceeding. One copying a claim from a patent has the burden of showing that his application clearly supports the count. In determining applicant's right to make a copied claim, all limitations in the claim will be considered material and doubts arising as to such right must be resolved against the copier. Where support must be based on an inherent disclosure, it is not sufficient that a person following the disclosure might obtain the result set forth in the count; it must invariably happen. See Smith v. Wehn, 318 F.2d 325, 50 CCPA 1544, and Dreyfus v. Sternau, 357 F.2d 411, 53 CCPA 1050.

In support of his contention that he can make the counts in issue, Gubelmann proposes "first," "second," and "third" ·definitions· of his actuator and connecting means.. His "first" definition actuator comprises lever 363, member 367 and pawl 371, with hook 396 excluded. The second additionally includes all of the hook except the nose, while the third includes all of the hook. Three connecting means definitions respectively fitting with the actuator definitions are also discussed. Regardless of which definition is adopted, Gubelmann urges that the actuator is completely controlled during its restoration by the action and position of the drive means, rod 398. He states:

*Restoration of the "actuator" never occurs unless the rod 398 rises; if it does rise, restoration always occurs. The speed of restoration depends directly on the speed with which rod 398 rises.* The drive means rod 398 is the only thing that is directly motivated by a power source to restore the actuators.

In response to Gang's contention that the return spring 365 provides all the force required to return the actuator, Gubelmann argues that such requires, first, the assumption that hook 396 forms no part of the actuator, for clearly spring 365 cannot restore the hook unless rod 398 moves to restore the actuator. Second, it is urged, spring 365 is disclosed only as *holding* lever 363 against stop, 366, the inference being that it would not possess sufficient strength to *restore* the actuator. The tension of such a spring is allegedly known in the art to be light since the tension of a plurality of them, one for each order of actuators, would be added together to resist forward operation. Furthermore, it is suggested that

wear, misalignment, corrosion or the presence of dirt might cause the bearings of lever 363 to stick, with the result that rod 398 will then push directly on the bulge in the middle of the lever, thus bringing it within the language of the claim which allegedly "does not require that it be so operated at every cycle of the machine." Appellant concludes that while spring 365, by its inherent nature, may assist restoration of the actuator, it cannot initiate such restoration which is entirely dependent upon the return stroke of rod 398. Therefore, the drive means bail rod 398 is "operable in a return stroke to restore" as required by the counts.

We are not persuaded by this argument. We believe that the "first" definition actuator, set forth above, conforms to the only reasonable reading of the counts on Gubelmann's disclosure. The second and third definitions arbitrarily include hook 396 as part of the actuator when in actuality it appears to be more of a connecting element. Moreover, the second definition arbitrarily subdivides the unitary hook into two components, and assigns one portion to the actuator and another portion, the nose, to the connecting means. This is without reason.

We find unconvincing appellant's attempt to now limit the function of spring 365. We agree with the board that "return spring 365" was intended to be just that, a *return* element. The parent patent discloses that the torsion spring "serves to *rotate* the lever * * * counterclockwise" (emphasis ours), further indicative of its function. Appellant's speculation as to instances of inoperativeness in his device appears to us to be rather far-fetched. We are not concerned with what *might* happen if the mechanism fails to operate as intended. Additionally, we note that slot 901 in Fig. 124 (430 in Fig. 29) terminates below the bulge of lever 876 (363 in Fig. 29), thus precluding rod 867 (398 in Fig. 29) from restoring the lever completely. Even acknowledging that rod 398 "*controls*" the return of lever 363, this still

fails to meet the express requirement that it operate to "*restore*" the lever.

Appellant directs our attention to Christian v. Muller, 104 F.2d 361, 26 CCPA 1324, as allegedly involving a situation remarkably similar to that of the present interference. There the counts in an interference described a calculating machine carriage mechanism. Count 9 recited that the machine had motor-driven operating means and front-feed means having portions forming a front-feed throat (for paper insertion). The count further recited "throat opening means operable by power furnished by said motor driven operating means during a cycle of operation of said machine * * * for moving said front-feed means to open throat position." The appellant applied the power of an electric motor directly to the front-feed means in order to open its throat. The question was whether the language was supported by the appellee's arrangement in which a motor first wound a spring, the release of which then operated the front-feed throat opening means at the appropriate time. The court held that it did, saying:

> That the front-feed throat opening means is operated indirectly by the motor in appellee's construction is clear. In each cycle of operation of the machine the motor tightens the spring, storing its energy for use in the next cycle of operation of the machine.

> We find nothing in said counts requiring the front-feed throat opening means to be operated directly by the motor, and we are not at liberty to read the word "directly" before the word "operable" in said counts.

Appellant contends that the reasoning applied in *Christian* applies here and that the count language in issue is met by rod 398 indirectly winding spring 365 during its clockwise movement.

At first glance, appellant's argument appears impressive; however, it overlooks the fact that the language involved

here is narrower than that in *Christian* and specifically requires that the drive means operate in its *return stroke* to restore the actuator. At best, charging of spring 365 here can be characterized only as resulting in the drive means operating in its *forward stroke* to later permit restoration of the actuator.

We have considered fully all arguments of the parties; however, we think it apparent from the foregoing that Gubelmann has not discharged the burden which the law imposes on one in his position. Accordingly, the decision of the board is affirmed.

Affirmed.