55 CCPA

**Richard F. DYER, Appellant,**

v.

**Frederick C. FIELD, Jr., Appellee.**

**Patent Appeal No. 7815.**

United States Court of Customs and Patent Appeals.

Dec. 14, 1967.

Andrew E. Taylor, William R. Hinds, Washington, D. C. (Roberts B. Larson, Larson & Taylor, Washington, D. C., of counsel), for appellant.

William B. Cridlin, Jr., A. Newton Huff, James T. Corle, Wilmington, Del., for appellee.

Before WORLEY, Chief Judge, RICH, SMITH, and ALMOND, Associate Judges, and Judge WILLIAM H. KIRKPATRICK.*

WORLEY, Chief Judge.

The sole issue raised by Dyer[1] in his appeal from the decision of the Board of Patent Interferences awarding priority of invention to Field[2] is whether, as the board held, Field is entitled under 35 U.S.C. § 120 to rely upon the 1954 filing date of his parent application to establish priority with respect to the subject matter of the single count:

1. A bulky yarn comprising a separate core yarn and separate excess yarn *interwoven* back and forth in said core yarn, said excess yarn at a number of random points *extending through* said core yarn and forming a multitude of elongated loops on the outside of said core yarn, said finished yarn having an increase of denier of greater than 50% over the combined denier of the untreated core and excess yarn. (Emphasis supplied)

The product is illustrated diagrammatically in Figs. 1 and 2 of Dyer's application.

*Fig. 1*
= CORE·
= EXCESS

*Fig. 2*
⊘ = CORE
= EXCESS

5/1 EXCESS/CORE RATIO

---

\* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

1. Dyer is involved on application Serial No. 752,067, filed July 30, 1958, as a continuation-in-part of Serial No. 544,886, filed November 4, 1955.

2. Field is involved on application Serial No. 790,789, filed January 30, 1959, as a continuation-in-part of Serial No. 450,075, filed August 16, 1954.

The record shows that the bulky yarn product defined by the count is made by feeding the "core" yarn into an air jet at a rate slightly faster than it is removed, while feeding the "excess" yarn into the same jet at a rate substantially faster than it is removed. The slight "overfeed" of the "core" yarn, coupled with the turbulence of the air stream in the jet, causes the core filament bundle to open up or "bloom" without forming convolutions, thus permitting the "excess" yarn to penetrate in and out of the "core" yarn as the "excess" yarn filaments form loops as a result of their excessive overfeed. The "core" yarn serves as a stress-bearing member in the final product, whereas the "excess" yarn provides the bulk.

The controversy finds its genesis in whether the 1954 Field specification contains a "written description"[3] of a bulky yarn having the structure defined by the count limitations to which we have added emphasis above, viz. whether that application discloses that the product consists of separate "excess" yarn *interwoven* back and forth in the "core" yarn, *extending through* it at a number of random points, as well as whether it adequately describes the "manner and process of making" that product.

Some background as to the disclosures of the 1959 and 1954 Field applications, with reference to the drawings common to each, will facilitate understanding of the issue involved.

Both Field applications disclose a number of different bulky yarn embodiments and techniques for obtaining them. In a first embodiment common to both applications, "excess" yarn 1 alone is supplied from package 6 to air jet 9 (Fig. 1) at a feed rate substantially greater than that at which it leaves the jet. Accord-

*Fig. 1*

---

3. In Swain v. Crittendon, 332 F.2d 820, 51 CCPA 1459, we pointed out that, where an applicant contends that he is entitled to rely upon one or more previously filed applications under § 120, the previously filed application(s) must comply with the first paragraph of 35 U.S.C. § 112, which reads:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

ing to the specification, turbulence in the air jet forms a multitude of elongated loops extending from the central region of the yarn, as illustrated in Fig. 4. The bulked yarn is subsequently twisted and wound on bobbin 17. No separate stress-bearing core yarn is incorporated with the bulked excess yarn.

*Fig. 4*

*Fig. 5*

In a second embodiment common to both applications, a stress-bearing "core" yarn 21 is supplied from package 22 and combined or plied at pigtail 8 with the bulked "excess" yarn *after* the latter emerges from the jet. The combined yarns are wound on bobbin 17 at the same rate at which the "core" yarn is supplied. The resultant product, illustrated in Fig. 5, is described as having loops "completely about" the body of the "core" yarn.

Field does not assert that either of the above two embodiments of his applications provides a product satisfying the limitations of the count in controversy. Rather, he relies here, as below, on the "broken line" modification depicted in Fig. 1. As the description of that modification appearing in the 1959 application is greatly expanded when compared with that appearing in the 1954 application, it will be helpful to discuss the two disclosures separately.

The 1959 application describes a "particularly desirable" third product, characterized by high bulk and stability under tensile strength, in which the "core" yarn and "excess" yarn are held together by an "entanglement" between the filament elements of the two yarns. To make that product, Field discloses that the "core" yarn and "excess" yarn are both fed to the air jet in a particular manner, the tension of the "core" yarn being controlled in a manner to prevent formation of convolutions or loops there-in yet permit the "core" yarn to open up to receive the looping "excess" yarn. In referring to the "broken line" modification of Fig. 1, Field states:

If desired, the operator may feed the core yarn into the jet along with the yarn to be convoluted into the described configuration. This path for the core yarn (shown as a dashed line in Figure 1) requires sufficient tensioning, conveniently provided by gate tensioner 25 interposed between pigtails 23 and 24, to prevent convolution of this component by action of the jet, *but low enough to permit opening of the core bundle to entangle with the effect system.* Early combination of the two components not only minimizes separate accumulation of like static charges otherwise sufficient to hinder introduction of the filamentary core but also facilitates distribution of the core filaments throughout the product, making for desirable uniformity. [Emphasis supplied]

Some 17 examples relating to the procedure required to make that product are provided by Field in his 1959 application. In all but one the speeds at which the "excess" and "core" yarns are fed to the jet are substantially greater and slightly greater, respectively, than the windup speed. The yarn made in accordance with that procedure does not appear to be illustrated in the 1959 application.

The sole disclosure in the 1954 application relating to the "broken line"

modification of Fig. 1 is a somewhat truncated version of the paragraph reproduced above from the 1959 application:

> If desired, the operator may feed the core yarn into the jet along with the yarn to be convoluted into the described configuration. This path for the core yarn (shown as a dashed line in Figure 1) requires sufficient tensioning, conveniently provided by gate tensioner 25 interposed between pigtails 23 and 24, to prevent convolution of this component by action of the jet. Early combination of the two components not only minimizes separate accumulation of like static charges otherwise sufficient to hinder introduction of the filamentary core but also facilitates distribution of the core filaments throughout the product, making for desirable uniformity. Upon emergence from the jet the composite yarn is wound up in the usual manner.

Unlike the 1959 application, the 1954 application makes no explicit reference to any "entanglement" between the "core" yarn and "excess" yarn. Nor does that specification include mention of the fact that tensioning of the "core" yarn must be "low enough to permit opening of the core bundle to entangle with the effect system." Nor does the 1954 application include the 17 examples appearing in the later application.

Dyer does not contend here that the description of the bulky yarn in Field's 1959 application is insufficient to satisfy the limitations of the count, nor does he question whether that application adequately describes how to make that product. Dyer asserts, however, that, in view of the differences between the two Field applications, as summarized above, it is "indeed remarkable" that the board stated that, with one exception not pertinent here, it "noted no essential difference between the Field 1954 and 1959 applications."

The board appears to have adopted the examiner's findings on the present issue in toto, adding but little explanatory comment of its own. The examiner, in turn, agreed with Field that the disclosure of his 1954 application satisfied the limitations of the count in controversy here, stating:

> * * * It is contended by the party Field that although the word "interwoven" or the words "extending through" are not used in describing the structure of the excess yarn, both the parent and continuation-in-part applications of Field support each of the limitations recited in the count. * * * An examination of the disclosure of the applications of Field reveals the statements "Early combination of the two components * * facilitates distribution of the core filaments throughout the product, making for desirable uniformity" * * * and "the loops are not spaced at regular intervals along the lengths of filament but appear instead to occur at random, frequently overlapping one another" * * *. The significance of these statements is made even clearer by reference to Figures 4 and 5 of the drawings. Interpreting the meaning of the word "interwoven" [4] and the phrase "extending through said core yarn" in light of the dictionary definition, the specifications and drawings of the Field applications, it must be concluded that these limitations of the count find proper support in each of the applications. * * *

The examiner was of the view that Field's process "would permit the core structure to readily open in the turbulent zone to receive the filaments of the excess component as illustrated in Figs. 4 and 5 of Field."

▇▇ The examiner properly recognized that the count limitations "interwoven" and "extending through" need not be set forth *in haec verba* in the dis-

---

4. Earlier, the examiner had noted:
     * * * the word "interweave" is defined in Webster's New International Dictionary, Second Edition, as follows:

   "1. to weave together; to intermix or unite in texture or construction; to intertwine; 2. to intermingle".

closure relied upon. In Binstead v. Littmann, 242 F.2d 766, 44 CCPA 839, we stated:

> * * * It is sufficient if, as in this case, the specification is so worded that the *necessary and only reasonable* construction to be given the disclosure by one skilled in the art is one which will lend clear support to each positive limitation in the interference count.

The question remains what "necessary and only reasonable" construction is to be given the 1954 Field specification language

> * * * Early combination of the two components * * * facilitates distribution of the core filaments throughout the product, making for desirable uniformity. * * *

so heavily relied upon by the examiner and board below and Field here.

■ We do not think that, merely because the core filaments are broadly disclosed by Field's 1954 specification to be distributed "throughout" the product, the excess yarn is necessarily *interwoven* with the core yarn or extends *through* it at a number of random locations as required by the count. While the quoted language of the 1954 specification could be construed as synonymous with the count limitations, it seems to us that, as Dyer points out, it is also consistent with a product in which the loops of the excess

yarn are *wrapped around* the core yarn, rather than extending *through* it, at random points along its length. To be sure, the examiner relied upon the drawings of Field to support his construction of the count and specification language. But those drawings provide no support whatsoever for the examiner's interpretation of the Field disclosure, for they do not purport to illustrate a product in which excess yarn is interwoven with a core yarn, extending *through* it at random locations. Indeed, as observed earlier, Fig. 5 illustrates a product in which the excess yarn *is* wrapped around the core yarn, with no apparent opportunity for the core yarn to open to allow excess yarn filaments to pass through it, while Fig. 4 illustrates a product containing no separate core yarn at all.

■ A consideration which reinforces our conclusion is the fact that Field's 1954 specification nowhere mentions the need for, or the result of, control of tension of the core yarn to "permit opening of the core bundle" that results in the type of entangling with the excess yarn described in his 1959 application. Absent such a disclosure, or a disclosure of the rate of core yarn feed being sufficiently greater than the wind-up rate whereby the core yarn may open to permit the looping excess yarn to extend through it,[5] we cannot say, with the de-

---

5. It is of more than passing interest to observe that the examiner denied the motion of a third party to dissolve the interference as unpatentable over the following disclosure of Breen patent No. 2,-852,906, directed to forming a bulky yarn by passing two separate groups of filaments into an air jet:

> * * * Stress-bearing filaments can also be used to provide stability, e. g., unbulked filaments can be plied with bulked yarn, or some of the filaments passing through the air jet can be kept under such tension that little or no bulking of these stress-bearing filaments occurs. That is, a group or bundle of filaments can be fed to the air jet at a lower rate, e. g., at substantially the speed of the wind-up device, than the rest of the filaments, thereby keeping such group of filaments under

tension and preventing the formation of loops therein.

The examiner stated:

> * * * the quoted passage of the Breen patent fails to indicate that the tension of the slower fed filaments is such as to permit them to open and separate for penetration by the excess yarn filaments. Therefore, the disclosure of the limitations of the count "interwoven" and "extending through said core yarn" in the Breen patent is not to be found and is at best conjectural. * * * *

> * * * * * *

> * * * The argument of the * * * [third party] is based entirely on the premise that the statement that a "little" bulking of the stress-bearing filaments may occur inherently permits sufficient opening and separation of

gree of certainty required in cases of this kind,[6] that the necessary and only reasonable interpretation of Field's 1954 specification, considered in its entirety, is that it provides a "written description" of the invention and of the "manner and process" of making it. With due respect for the board's position, on the record before us we conclude that the examiner and board clearly erred in finding support for the count limitation therein. Accordingly, we are obliged to reverse its decision.

Reversed.

RICH, J., concurs in the result.

KIRKPATRICK, J., dissents.

Hill, Sherman, Meroni, Gross & Simpson, Carlton Hill, Chicago, Ill. (Max R. Chambers, Chicago, Ill., of counsel) for appellant.

Joseph Schimmel, Washington, D. C. (Joseph F. Nakamura, Washington, D. C., of counsel) for the Commissioner of Patents.

Before WORLEY, Chief Judge, RICH, SMITH and ALMOND, Judges, and WILLIAM H. KIRKPATRICK.*

these filaments for penetration by the filaments of the excess yarn. This conclusion does not necessarily follow as the intensity of the air turbulence and the yarn tension required to permit a little bulking of these filaments is much different than that required to open and separate them sufficiently to permit penetration by the filaments of the excess yarn.

It seems to us that the examiner's pertinent comments as to the adequacy of the Breen disclosure are of equal applicability to the disclosure of the 1954 Field application which, as phrased, does not expressly permit a "little bulking" of the core yarn.

6. As stated in Brand v. Thomas, 96 F.2d 301, 25 CCPA 1053:
   * * * Lack of clear disclosure is not supplied by a speculation as to what one skilled in the art might do or might not do if he followed the teaching of the inventor. The disclosure should be clearer than to suggest that one skilled in the art *might* construct the device in a particular manner. * * *

