**STAMICARBON, N.V. and Mathieu Bongard, Plaintiffs,**

v.

**CHEMICAL CONSTRUCTION CORPORATION, Defendant.**

**Civ. A. No. 4442.**

United States District Court,
D. Delaware.

July 30, 1975.

John G. Mulford of Theisen, Lank & Mulford, Wilmington, Del., and Carl G.

Love, of Cushman, Darby & Cushman, Washington, D.C., of counsel, for plaintiffs.

Arthur G. Connolly, Jr., of Connolly, Bove & Lodge, Wilmington, Del., and Berj A. Terzian, Stanton T. Lawrence, Jr., Clyde C. Metzger, and Gidon D. Stern, of Pennie & Edmonds, New York City, of counsel, for defendant.

## OPINION

LATCHUM, Chief Judge.

In this action, the Court is called upon to review a decision of the United States Patent Office Board of Patent Interferences which, in an interference proceeding, awarded priority of two patent counts to the plaintiff, Mathieu Bongard ("Bongard") over Ivo Mavrovic, the assignor of the defendant, Chemical Construction Corporation ("Chemico"). Jurisdiction is based on 35 U.S.C. § 146 and 28 U.S.C. § 1338.[1]

The pertinent facts are as follows: The plaintiff, Stamicarbon, N.V. ("Stamicarbon") is the assignee of a U. S. patent application on a process for synthesizing urea which was filed by the plaintiff Bongard on March 23, 1966 (the "Bongard application").[2] The Bongard application is a continuation of a parent U.S. application filed by Bongard in the United States Patent Office on September 5, 1961 (the "parent application").[3] For the purpose of establishing the priority of the invention disclosed by the Bongard application, Bongard relies on the parent application which in turn relies for priority purposes on an application for a Netherlands patent filed by Bongard in the Netherlands on September 5, 1960 (the "Netherlands application").[4] The defendant, Chemico, is the assignee of a U.S. Patent on a process for synthesizing urea which issued on March 9, 1965 from a U.S. application filed by Mavrovic on June 16, 1961 (the "Mavrovic patent").[5]

The Mavrovic patent and Bongard application both relate to an alleged improvement in the synthetic production of urea from carbon dioxide and ammonia. When carbon dioxide and an excess amount of ammonia are subjected to high pressure in a reaction vessel, they engage in a reversible reaction to form an intermediate product called ammonium carbamate and release a large amount of heat. In the reaction vessel, a portion of the ammonium carbamate, in turn, slowly converts or dehydrates into urea and water.

The particular prior art urea synthesis system alleged to have been improved by both Mavrovic and Bongard involves taking a process stream containing a mixture of excess ammonia, unconverted ammonium carbamate, urea and water from a pressurized reaction vessel, expanding the volume of the process stream to reduce the pressure and temperature of the mixture and then heating the mixture at the reduced pressure. Reducing the pressure of the mixture causes a partial decomposition of ammonium carbamate back into carbon dioxide and ammonia. Heating the mixture causes the further decomposition of

---

1. The plaintiffs originally brought this action in this court as a declaratory judgment to uphold the Board's decision which was favorable to them. A timely counterclaim was asserted by the defendant pursuant to 35 U. S.C. § 146 to overturn the Board's decision. The Court, as a matter of discretion, dismissed the plaintiffs' action for declaratory relief and proceeded to conduct the review of the Board's decision pursuant to the defendant's counterclaim under 35 U.S.C. § 146. *Stamicarbon, N.V. v. Chemical Construction Corp.*, 355 F.Supp. 228 (D.Del. 1973).

2. Ser. No. 547,116, Trial Exhibit MX–3.

3. Ser. No. 135,991, Trial Exhibit MX–2. By an amendment on January 28, 1969, the continuation application became a "continuation-in-part" of the parent application.

4. Under 35 U.S.C. § 119, an applicant for a U.S. patent is entitled to the filing date of a prior application in a foreign country on the same invention provided the U.S. application is filed within 12 months of the *earliest* foreign filing.

5. U.S. Patent No. 3,172,911, Trial Exhibit MX–1.

ammonium carbamate. The carbon dioxide and ammonia formed from decomposed ammonium carbamate, along with water vapor and the excess ammonia present in the process stream form an off-gas which in the prior art is separated from the process stream to leave behind in the process stream a liquid mixture. This liquid mixture is primarily composed of urea and water which readily yields the desired urea. The off-gas is itself partially condensed to form an aqueous solution of ammonium carbamate (i. e., a solution of ammonium carbamate and water) which solution is recycled to the reaction vessel. The uncondensed portion of the off-gas is then primarily composed of ammonia and is also recycled to the reaction vessel.

Both Mavrovic and Bongard recognize the desirability of refining this prior art system to minimize the amount of water recirculated through the system from the recycled aqueous solution of ammonium carbamate. They both seek to reduce the water content in the aqueous solution of ammonium carbamate by separating from the process stream an off-gas consisting of carbon dioxide, ammonia and water vapor existing in the mixture after the pressure of the mixture is reduced but before the mixture is heated. This first off-gas is combined with a second off-gas which is separated from the liquid portion of the mixture in the process stream after heating the mixture as is taught by the prior art. A combined gas consisting of the first and second off-gases is, according to Mavrovic and Bongard, lower in water content than the single off-gas of the prior art, and accordingly, the water content of an aqueous solution of ammonium carbamate derived from the combined gas is lower than the water content of an aqueous solution of am-

monium carbamate derived from the single off-gas of the prior art. The Mavrovic patent's single drawing and Figure 3 of the Bongard application are nearly identical.

The Bongard application contains claims 1 and 2 of the Mavrovic patent which had been added to the parent application on February 9, 1966.[6] These two claims became the two counts of an interference declared in the Patent Office on April 2, 1969 between the Bongard application and the Mavrovic patent [7] which interference provides the basis for this suit.

In the interference proceeding, Bongard relied upon the September 5, 1960 filing date of his Netherlands application to establish priority over the Mavrovic patent. Mavrovic relied on his June 16, 1961 filing date and a three prong attack on Bongard's right to any earlier date. First, Mavrovic argued and attempted to prove that none of the disclosures in Bongard's Netherlands, parent, or continuation applications support the two counts in interference. Second, Mavrovic contended that Bongard was barred from relying on the September 5, 1960 filing date of the Netherlands application under 35 U.S.C. § 119 because the subject matter of the U.S. application was, according to Mavrovic, inherently disclosed in five of Bongard's earlier filed foreign applications. Third, Mavrovic argued that the oath accompanying Bongard's parent application was false and the application thereby fatally defective because the oath failed to disclose that two original method claims in Bongard's parent application were allegedly anticipated by the combination of art acknowledged in the Netherlands application to be old and the teaching of Bongard's U.S. Patent No. 3,120,563 (the " '563 Bongard patent").[8]

6. 35 U.S.C. § 135(b) requires a claim of an issued patent be copied by an applicant, if ever, prior to one year from the date on which the patent was issued. The Mavrovic patent issued on March 9, 1965.

7. Interference No. 96,734, Docket Item 80, p. 6.

8. Filed July 30, 1959, issued February 4, 1964. Trial Exhibit MX–5.

The Board of Patent Interferences rejected each of Mavrovic's arguments and found that Bongard was entitled to the Netherlands filing date for his continuation application. The Board accordingly awarded Bongard priority over Mavrovic.[9] Chemico, as Mavrovic's assignee in interest, herein seeks to have the Board's decision set aside under the provisions of 35 U.S.C. § 146.

The Supreme Court in *Morgan v. Daniels*, 153 U.S. 120, 14 S.Ct. 772, 38 L.Ed. 657 (1894) definitively set out the principles governing an action of the type now provided under 35 U.S.C. § 146. The Court noted that such an action is:

" . . . something more than a mere appeal. It is an application to the court to set aside the action of one of the executive departments of the government. The one charged with the administration of the patent system had finished its investigations and made its determination with respect to the question of priority of invention. That determination gave to the defendant the exclusive rights of a patentee. A new proceeding is instituted in the courts,—a proceeding to set aside the conclusions reached by the administrative department, and to give to the plaintiff the rights there awarded to the defendant. It is something in the nature of a suit to set aside a judgment, and, as such, is not to be sustained by a mere preponderance of evidence." 153 U.S. at 124, 14 S.Ct. at 773.

■ The burden of proof required of a party who lost in the Patent Office proceedings was defined by the Court as follows:

"Upon principle and authority, therefore, it must be laid down as a rule that, where the question decided in the patent office is one between contesting parties as to priority of invention, the decision there made must be accepted as controlling upon that question of fact in any subsequent suit between the same parties, unless the contrary is established by testimony which in character and amount carries *thorough conviction*." 153 U. S. at 125, 14 S.Ct. at 773. (Emphasis added).

The *Morgan* "thorough conviction" rule has been expressly recognized and consistently followed in the Third Circuit in § 146 proceedings:

"Then when the question moves to the district court, while the case is heard de novo, we have the strict injunction laid down by *Morgan v. Daniels* . . . that the patent office's finding is not to be disturbed unless there is 'thorough conviction' that a mistake has been made. The force of *Morgan v. Daniels* has been repeatedly recognized by this Court. [Footnote omitted]." *Radio Corp. of America v. International Stand. E. Corp.*, 232 F.2d 726, 729 (C.A. 3, 1956).

Also see *Ransburg Electro-Coating Corp. v. Sedlacsik*, 397 F.2d 804 (C.A. 3, 1968) and *Philco Corporation v. Radio Corporation of America*, 276 F.Supp. 24, 26 (D.Del.1967).

It is in accordance with this rule that the Court turns to the issues in this case.

I. Bongard's Support for the Counts.

There are two counts in issue in this action. Count 1 is representative of both counts and reads:

"In a urea synthesis process in which ammonia, carbon dioxide and recycled aqueous ammonium carbamate solution are reacted at elevated urea synthesis pressure to form urea, the resulting process stream containing urea, unconverted ammonium carbamate, excess ammonia and water is heated at reduced pressure to decompose ammonium carbamate, an off-gas containing water vapor, excess ammonia, and ammonia and carbon dioxide derived from said ammonium carbamate decomposition is separated from

9. Trial Exhibit BX–15.

the residual process stream containing product urea, said off-gas is at least partially condensed to form an aqueous ammonium carbamate solution, and said aqueous solution is compressed and recycled to urea synthesis, the improvement which comprises reducing the pressure of the urea synthesis effluent process stream under substantially adiabatic conditions thereby decomposing ammonium carbamate, separating a first off-gas having low water vapor content from the residual process stream, heating the residual process stream to further decompose ammonium carbamate, separating a second off-gas of higher water vapor content, and combining said first and second off-gases to produce a combined off-gas stream from which aqueous ammonium carbamate solution is condensed and recycled, whereby said combined off-gas stream contains substantially less water vapor than an off-gas stream produced by simultaneous pressure reduction and heating to decompose ammonium carbamate, in which a single off-gas stream is removed from the process stream." (Trial Exhibit BX–5).

Count 2 is similar to count 1 but concerns a two stage urea synthesis process in which both stages contain the improvement set out in count 1. (Trial Transcript, Tr. 90 and 103).

It is Chemico's position that the Bongard application does not support count 1 since, according to Chemico, the count requires the separation of the first off-gas be done adiabatically (i. e., without the addition or subtraction of heat, Tr. 58) and the Bongard application neither expressly nor inherently discloses that limitation.

■ It is well established that a count copied from a patent is to be construed as broadly as the language of the count will reasonably permit. *Buck v. Desvignes*, 489 F.2d 737, 740 (C.C.P.A. 1973); *Walberg v. Probst*, 474 F.2d 683, 687 (C.C.P.A. 1973); *Weiss v. Roschke*, 425 F.2d 772, 776 (C.C.P.A. 1970); *Application of Beale*, 378 F.2d 970, 974 (C.C.P.A. 1967).

"The counts are broadly drawn, and, not being ambiguous, must be given the broadest construction which they will reasonably permit. Limitations, not expressly defined, cannot be read into them for the purpose of avoiding the issue of priority."

*Martin v. Friendly*, 58 F.2d 421, 422 (C.C.P.A. 1932).

"Had appellant desired to limit his claims to a particular kind or type of kraft paper, he might have done so. However, having deliberately elected to claim the invention broadly, he is not in a position to insist that limitations be read into his claims (the counts in issue) for the purpose of avoiding the issue of priority."

*Deibel v. Heise*, 46 F.2d 570, 571 (C.C.P.A. 1931).

■ In the absence of ambiguity it is neither necessary nor proper to look to the specification of the patent from which the count was copied for interpretation of the count. *Carlson v. Nagata*, 480 F.2d 1372, 1375 (C.C.P.A. 1973); *Hemstreet v. Rohland*, 433 F.2d 1403, 1406, 58 C.C.P.A. 743 (1970); *Phillips v. Lynch*, 367 F.2d 601, 604 n. 2, 54 C.C.P.A. 781 (1966); *Stansbury v. Bond,* 482 F.2d 968, 975 (C.C.P.A. 1973).

The critical language of count 1 reads:

". . . the improvement which comprises *reducing the pressure* of the urea synthesis effluent process stream under *substantially adiabatic conditions* thereby decomposing ammonium carbamate, *separating* a first off-gas having low water vapor content from the residual process stream. . . ." (Emphasis added).

The term "substantially adiabatic conditions" appears only once in the count and then it unambiguously refers to "reducing the pressure" of the process stream. There is no reference in the phrase which contains the "substantially adiabatic" recitation to any separation

operation. It is only in the next phrase that there is the first reference to "separating" gas from the residual stream, but in that phrase there is no reference whatsoever to the existence of "substantially adiabatic conditions."

However, finding there is no express limitation in the count that the first off-gas be separated under substantially adiabatic conditions does not mean the count is necessarily without ambiguity. In fact the term "separating a first off-gas" is less than definitive because the source of the gas is unarticulated except that the gas is required to somehow be derived "from the residual process stream." In addition, the only hint as to any limitations on the conditions under which separation must be accomplished is the requirement that the first off-gas be separated in a manner which results in the first off-gas having a "low water vapor content." It is Chemico's position that this language requires the separation be conducted under adiabatic conditions. It is Bongard's position that no such requirement should be read into the count; that at most the language merely requires there be no heating of the process stream before separation of the gas and liquid phases already present in the stream. The nonspurious arguments presented by both parties in support of their positions confirm that the count does contain a latent ambiguity which warrants recourse to the Mavrovic patent specification and file history for interpretation. *Munch v. Peterson*, 420 F.2d 758, 762 (C.C.P.A. 1970); *McCutchen v. Oliver*, 367 F.2d 609, 611 and 616, 54 C.C.P.A. 756 (1966).

Reference to the Mavrovic patent specification and file history for clarification of this ambiguity in count 1 reveals the essence of Mavrovic's invention to be separation of a first off-gas from the process stream before the stream is heated and additional gases are thereby evolved. As a consequence, the source of the first off-gas is gas evolved from spontaneous decomposition of ammonium carbamate when the pressure of the process stream is reduced under the required "substantially adiabatic conditions" in contrast to the prior art wherein the separated gas included gas evolved from direct heating of the process stream.

In particular, the Mavrovic patent specification states:

> *"Instead* of pressure reduction *combined* with heating of the process stream to drive off a *single* off-gas . . . the pressure of the process stream is reduced in a flash reduction stage under substantially adiabatic conditions. This results in *spontaneous* decomposition of ammonium carbamate and *evolution* of considerable off-gas. . . . The resulting off-gas . . . is *then separated.* . . . The process stream is *thereafter heated* . . . to promote . . . generation of *additional* off-gas."

Trial Exhibit MX-1, Col. 2, lines 7–19. (Emphasis added).

The Mavrovic file history states:

> ". . . the critical aspect of separate removal of a first off-gas after adiabatic expansion and prior to heating of the effluent stream is clearly pointed out in claims 1 and 2."

Trial Exhibit BX-1, p. 27.

> ". . . in the present invention, the effluent is expanded, off-gas is removed, and *then* after off-gas removal the residual liquid stream is *separately* heated to generate a *separate* stream of off-gas at the same pressure level."

Trial Exhibit BX-1, p. 26.

While Mavrovic repeatedly emphasized that the first off-gas was not to be evolved by heating, at no point in the specification of his patent or the file history does Mavrovic teach that the separation of this off-gas from the liquid in the process stream must be conducted under adiabatic conditions. To the contrary, the separator used in the

Mavrovic patent is simply defined as "any suitable apparatus such as a cyclonic cylindrical vessel provided with internal baffles or whirl vanes." Trial Exhibit MX–1, Col. 3; Tr. 659. The language asserted by Chemico to require both the expansion and the separation to be adiabatic is unpersuasive. For example, Chemico cites the following passage from Mavrovic's file history wherein Mavrovic was attempting to distinguish his invention over cited prior art in which a first off-gas is formed *both* by pressure reduction which is adiabatic and hence spontaneously evolves an off-gas *and* by heating which evolves additional off-gas:

"What is important in the present invention is that subsequent evolution of off-gas is *also* carried out adiabatically to generate a first off-gas stream which is completely separated from the liquid stream. This is followed by a *separate* heating of the residual liquid stream at the same pressure level, to generate additional off-gas which is subsequently combined with the first off-gas."

Trial Exhibit BX–1, p. 27.

The Court interprets this passage along with the other passages proffered by Chemico as evidence that the critical point of Mavrovic's invention is to separate the first off-gas from the process stream before heating the process stream. The first off-gas thereby removed from the stream does not include gas evolved from heating the process stream before separation is completed. Implicit in this analysis of the invention is the requirement that the separator itself not be used to apply heat to the mixture before separation is completed in a manner which would result in the evolution and subsequent separation off of the additional gases sought by the invention to be omitted from the first off-gas by the requirement of separating before heating. (Tr. 644–68).

Accordingly, the term "separating a first off-gas" recited in count 1 may fairly be said to include an unrecited limitation that the separation be completed *before* the process stream is heated. (Tr. 687).

Count 2 recites "separating said partial off-gas" from the process stream after defining "said partial off-gas" as being derived from the decomposition of ammonium carbamate due to pressure reduction of the process stream under "substantially adiabatic conditions." While a literal reading of this language does not expressly preclude heating the process stream before separation is completed and removing the additional off-gas thereby evolved in combination with the "said partial off-gas," the above analysis with respect to count 1 applies equally as well to count 2. Accordingly, count 2 may also be said to include an unrecited limitation that the recited separation be completed before the process stream is heated.

■ Having determined the scope of the counts, the Court turns to a consideration of whether Bongard's disclosure is sufficient to support the counts because to establish priority to a count copied from an issued patent an applicant must establish that his patent application discloses the "gist" of the invention as defined by that count, *Henderson v. Grable*, 339 F.2d 465, 470, 52 C.C.P.A. 920 (1964); *McCutchen v. Oliver*, 367 F.2d 609, 610, 54 C.C.P.A. 756 (1966), either expressly or inherently. *Hansgirg v. Kemmer*, 102 F.2d 212, 214 (C.C.P.A. 1939); *Foss v. Oglesby*, 127 F.2d 312, 317, 29 C.C.P.A. 1005 (1942). Each limitation of the count need not be set forth *in haec verba* in the patent application. It is sufficient if the disclosure in the application is so worded that the "necessary and only reasonable" construction to be given the application by one skilled in the art is one which will lend clear support to each limitation in the count. *Krohm v. Oishei*, 373 F.2d 992, 996, 54 C.C.P.A. 1260 (1967); *Dyer v. Field*, 386 F.2d 466, 471, 55 C.C.P.A. 771 (1967); *Binstead v. Littmann*, 242 F.2d 766, 770, 44 C.C.P.A. 839 (1957). However, to inherent-

ly disclose the invention, it is not sufficient that a person following the disclosure in the application might obtain the results set forth in the count because it must inevitably happen. *Stamicarbon, supra,* 355 F.Supp. at 234; *Gubelmann v. Gang,* 408 F.2d 758, 766 (C.C.P.A. 1969); *Dreyfus v. Sternau,* 357 F.2d 411, 415, 53 C.C.P.A. 1050 (1966).

In accordance with this understanding of the law, a comparison must be made between the interference counts as interpreted above and Bongard's disclosure in his application.[10] The first portion of count 1 recites the prior art which is sought to be improved by the invention. There is no dispute by the parties that Bongard's application concerns an improvement upon the same prior art process described in the count and, hence, provides support for each limitation recited in this portion of the count.

The dispute arises in the next portion of the count which reads:

"  .  .  .  the improvement which comprises reducing the pressure of the urea synthesis effluent process stream under substantially adiabatic conditions thereby decomposing ammonium carbamate, separating a first off-gas having low water vapor content from the residual process stream, heating the residual process stream to further decompose ammonium carbamate, separating a second off-gas of higher water vapor content, and combining said first and second off-gases to produce a combined off-gas stream from which aqueous ammonium carbamate solution is condensed and recycled, whereby said combined off-gas stream contains substantially less water vapor than an off-gas stream pro-

duced by simultaneous pressure reduction and heating to decompose ammonium carbamate, in which a single off-gas stream is removed from the process stream."

The count's requirement that the pressure of the process stream be reduced "under substantially adiabatic conditions thereby decomposing ammonium carbamate," is not expressly disclosed in the Bongard application. However, it is *inherently* disclosed by reason of the disclosed use of an expansion valve to reduce the pressure of the process stream and the unrefuted fact that pressure reduction through an expansion valve is inevitably adiabatic.[11] Once adiabatic pressure reduction occurs, by Mavrovic's own teachings, this:

"results in spontaneous decomposition of ammonium carbamate and evolution of considerable off-gas."

Trial Exhibit MX–1, p. 2.

As a result, by teaching the use of an expansion valve to reduce pressure, Bongard inherently teaches pressure reduction "under substantially adiabatic conditions thereby decomposing ammonium carbamate" and accordingly supports that limitation of the interference count.

The count's next requirement of "separating a first off-gas having low water vapor content from the residual process stream" and the Court's additionally imposed limitation that this separation be conducted before heating the process stream is expressly disclosed by Bongard. In particular, Bongard teaches:

"It has been found, in accordance with the invention, that this can be realized in a simple way by omitting the direct heating to a higher temperature of the

10. Chemico does not argue there is any significant difference between the disclosure in Bongard's Netherlands, parent, or continuation applications and accordingly reference will be made only to the Bongard continuation application. Trial Exhibit MX–3. Trial Exhibit BX–15, pp. 10–11.

11. "All such expansions are carried out under substantially adiabatic conditions since

the synthesis effluent is merely expanded through a valve." Trial Exhibit BX–1, pp. 26–27 and 37.
".  .  . expansion across the expansion valve per se is always adiabatic." (Docket Item 96, p. 17.)
Also see Trial Transcript, Tr. 83 and 258 wherein Chemico's expert witness confirms that all expansions through pressure valves are adiabatic.

expanded mixture and the subsequent separation of the resulting liquid and gas phases, and instead leading this mixture *after* expansion and *without* preheating, through a preliminary separator and heating the resulting liquid phase, after this leading the gas-liquid mixture then formed through another liquid separator."

Trial Exhibit MX–3, p. 7 (Emphasis added).

The count's requirement that the first off-gas have a "low water vapor content" whereas the second off-gas have a "higher water vapor content" is supported by Bongard's disclosure of an example using the invention wherein the first off-gas had a composition of:

"0.06 mole of $CO_2$
4.0 moles of $NH_3$
1.3 moles of $H_2O$"

whereas the second off-gas had a composition of:

"0.94 mole of $CO_2$
2.3 moles of $NH_3$
3.5 moles of $H_2O$"

Trial Exhibit MX–3, p. 9.

Furthermore, as is recited by the count the combined off-gases in Bongard's disclosure produce an ammonium carbamate solution having a water vapor content of "19.4%" whereas simultaneous pressure reduction and heating as practiced according to the prior art results in a water vapor content of "26.-5%."

In spite of the convincing, nearly *in haec verba* Bongard disclosure of the recited separation limitation, Chemico insists the disclosure fails to support the count because Bongard does not preclude using a heated "preliminary separator" which would alter the content of the resultant separated off-gases. However, the implicit requirement of the count that the separator itself not be used to apply heat to the mixture before separation is completed is satisfied by Bongard's express differentiation between simple separatory vessels and heated separatory vessels.

Bongard explains that the "preliminary vessels" used in Figure 3 of his application are:

". . . simple separatory vessels provided with a feed line for the liquid-gas mixture, arranged between a liquid discharge line at the base and a gas discharge line at the top of the vessel."

but that:

"It is also possible, however, to apply a liquid gas separator of a more complicated design. A very satisfactory preliminary liquid-gas separator is a separator designed as a scrubber. The arrangement will then be as shown in Figure 4. . . ."[12]

Trial Exhibit MX–3, p. 11.

It is the Court's conclusion, that the "necessary and only reasonable" construction of this language is that the separator in Figure 3 of the Bongard patent operates to simply allow whatever gas there is in the mixture entering the separator to flow out the top of the separator and liquid to flow out the bottom of the separator without any heating or other significant alteration of the mixture in contradistinction to the separator in Figure 4 wherein heat is applied to help effect separation. The fact one embodiment of Bongard's application teaches use of a heated separator does not alter the fact that in another embodiment of the application the disclosed separator operates without such heating and, therefore, supports the limitation of the interference count relating to separation of the liquid and gas phases of the mixture in the process stream.

Chemico also argues that the Bongard disclosure fails to expressly preclude cooling the process stream before separation and thus fails to support the count. A first defect in Chemico's argument is a failure of the count to express-

12. A scrubber is a separator in which heat in the form of recirculated hot gases is introduced into the separator. Tr. 258–59.

ly preclude cooling before separation. A second defect is Bongard's express directive to improve upon the prior art process of heating and then separating by the process of separating "without preheating." There is a total lack of any hint by Bongard that cooling should be undertaken before separation. The chance a person might go beyond Bongard's directive to eliminate the prior art step of heating and instead try cooling the process stream before separation does not alter the fact Bongard's disclosure clearly teaches a procedure which does not involve any cooling and, thus, supports the count even if it were to be interpreted as precluding cooling before separation.

█ In light of the above analysis of count 1 and Bongard's disclosure, and the fact the analysis applies equally as well to count 2, this Court finds, as did the Board of Patent Interferences, that Bongard's disclosure supports both counts of the interference.

## II. Bongard's Right to the Netherlands Filing Date.

To establish a priority date which antecedes Mavrovic's filing date of June 16, 1961, Bongard relies on the September 5, 1960 filing date of his Netherlands application.[13] Bongard is entitled to the September 5, 1960 filing date of his Netherlands application "if the application in this country is filed within twelve months from the *earliest* date on which such foreign application was filed." 35 U.S.C. § 119. (Emphasis added). Bongard's application in this country, the parent application, was filed on September 5, 1961 and therefore was "filed within twelve months" from the date on which the Netherlands application was filed.[14] Thus, Bongard is en-

titled to a September 5, 1960 date provided the Netherlands application is the "earliest" foreign application filed on the subject invention.

Chemico asserts that the Netherlands application was not the "earliest" foreign application filed by Bongard on the subject invention. Chemico proffers several foreign applications filed by Bongard, as evidence of earlier foreign applications contrary to the dictates of 35 U.S.C. § 119.[15] These foreign applications each disclose a process and apparatus for the preparation of urea from ammonia and carbon dioxide. The drawings of each of the foreign applications are identical to one another and each of the drawings expressly discloses a heater located between a pressure reduction valve and a separator. Accordingly, as was found by the Board of Patent Interferences, each of the foreign counterparts discloses on its face:

". . . a procedure which Mavrovic has characterized as prior art (heating the stream prior to any gas separation) from which he has distinguished his process." Trial Exhibit BX–15, p. 16.

The Board went on to hold:

". . . we do not regard them [the foreign applications] as disclosing a process of count 1. It is clear that the relied on foreign applications do not disclose a two stage operation as defined in count 2. We conclude that there is no violation of 35 U.S.C. § 119 and Bongard is entitled to the priority of the Netherlands application No. 255, 601 filed September 5, 1960."

Trial Exhibit BX–15, pp. 16–17.

Chemico argues that the heaters in each of the foreign applications are in fact not operating as heaters and that

---

13. Neither party has asserted any right to a priority date prior to these filing dates. See Trial Exhibit BX–15, p. 3.

14. See *Hess-Bright Mfg. Co. v. Standard Roller Bearing Co.*, 171 F. 114 (C.C.E.D.P.A.1909).

15. Trial Exhibit MX–6, MX–7, MX–13 and MX–14. Each of these applications is similar to the '563 Bongard patent, *supra* note 8.

therefore each of the foreign applications discloses the subject invention. The basis of Chemico's argument is a calculation performed by Bongard when he was attempting to persuade the Patent Office that no heat is added to the process stream disclosed in his continuation application. Chemico urges the Court to use the same calculation on the foreign applications to ascertain whether any heat is added to the process streams disclosed therein.

The difficulty with Chemico's argument derives from the necessity of having accurate temperature data of the process streams in order to perform the calculation. In the specifications of the foreign applications, there is a critical ambiguity concerning the temperature of the process streams. Applying the calculation to one interpretation of the specifications suggests the results urged by Chemico that the disclosed heaters are not working. However, applying the calculation to the other interpretation of the specifications suggests the naturally expected result that the disclosed heaters are in fact operating.

■ Confronted with this ambivalent evidence the Court is inclined to agree with the Board's finding that the heaters are working and hence, the foreign applications do not disclose the invention which is the subject of this suit. More importantly, the Court certainly cannot find that Chemico has established the Board to be in error by testimony "which in character and amount carries thorough conviction." Morgan, *supra,* 153 U.S. at 125, 14 S.Ct. at 773. Accordingly, the Court adopts the Board's decision on this matter finding that Bongard is entitled under 35 U.S.C. § 119 to the September 5, 1960 filing date of his Netherlands application.

## III. Bongard's Oath.

Bongard filed an oath [16] with his parent application in which he stated:

". . . I verily believe I am the original, first, and sole inventor of the invention in [the parent application] described and claimed therein; that I do not know and do not believe that this invention was ever known or used before my invention thereof. . . . "
Trial Exhibit MX–2, p. 17.

Chemico argues that Bongard should not be awarded priority over Mavrovic because Bongard's oath is false. Chemico argues the oath is false because the oath alleges in effect that all the original claims filed with the parent application define a new and patentable invention whereas, according to Chemico, original claims 1 and 2 of the parent application can be literally read on and therefore define nothing of invention over the combination of Figure 1 of the Bongard parent application which is acknowledged in the parent application to be prior art and the urea process disclosed in the '563 Bongard patent.[17]

■ An oath is not false merely if a statement contained therein ultimately proves to be inaccurate. To the contrary, the issue is not the ultimate truth of averments in an oath, but rather whether or not the averments were believed to be true. *Odierno v. Kordowski,* 160 U.S.P.Q. 426, 435 (P.O.B.P.I.); *Kelly Mfg. Co. v. Lilliston Corp.,* 180 U.S.P.Q. 364, 372 (E.D.N.C.1973). If the record does reveal that erroneous averments were known to be false when made then the oath may be found to be false. *Chromalloy American Corp. v. Alloy Surfaces Co.,* 339 F.Supp. 859, 872 (D.Del.1972).

The Court must therefore first determine if any averments in the oath are untrue and if some averments are un-

---

16. Each application for a United States patent must include an oath by the applicant, 35 U.S.C. § 111, or a written declaration in lieu thereof. 35 U.S.C. § 25.

17. See note 8, *supra.*

true the Court must then determine if those averments were known to be untrue when made.

According to Chemico, the critical averment in Bongard's oath is that the original claims of the parent application were patentable whereas, again according to Chemico, they were in fact not patentable and Bongard knew or should have known they were not patentable. A serious flaw in Chemico's position is its failure to assert any legal basis upon which the two original claims are unpatentable even if they could be read on the disclosure in the '563 Bongard patent in combination with Figure 1 of the parent application. The '563 Bongard patent is not prior art against the parent application, it not having issued more than one year prior to the filing of the parent application and it not being a patent "by another." 35 U.S.C. § 102. Accordingly, the Court is left to pure speculation as to why the two original claims might be unpatentable if they are found to read on the '563 Bongard patent in combination with Figure 1 of the parent application.

Declining Chemico's implied invitation to engage in such speculation, the Court instead turns directly to a consideration of whether or not the language of the original two claims does in fact read on the '563 Bongard patent in combination with Figure 1 of the Bongard parent application for if it does not, Chemico's entire argument fails.

In this regard, both the original claims of the parent application recite "a plurality of pressure stages." While plural pressure stage systems were known in the prior art, as evidenced by Figure 1 of the parent application, the '563 Bon-gard patent is explicitly designed to avoid using more than one stage and therefore is expressly distinguished from plural pressure stage systems.[18] In addition, both the original claims of the parent application recite "subjecting *the* gas-liquid mixture obtained by expansion to an *initial* liquid-gas separation" and any reasonable reading of the parent application reveals that this language was designed to prohibit heating the mixture before separation whereas both the '563 Bongard patent and Figure 1 expressly disclose use of a heater before separation.[19]

■ Accordingly, the Court finds that original claims 1 and 2 of the parent application do not read on the '563 Bon-gard patent in combination with Figure 1 of the parent application and as a consequence the Court finds that Chemico has failed to prove Bongard's oath to be false since Chemico has failed to prove any averments in the oath to be untrue.

In summary, Chemico has failed to prove that Bongard's continuation application does not support the two counts in interference, Chemico has failed to prove that Bongard does not have a right to the September 5, 1960 Netherlands filing date for priority purposes and Chemico has failed to prove that Bongard's oath in his parent application was not true. These being the only issues upon which Chemico challenged the Board of Patent Interferences' decision awarding priority of invention to Bongard, the Court will enter a judgment of priority in favor of Bongard.

The above shall constitute the findings of fact and conclusions of law required by Rule 52(a), F.R.Civ.P.

18. "Because a uniform pressure is maintained throughout the apparatus, control and operation are simple, and the prevention of operating problems is much easier." Trial Exhibit MX–5, col. 5, lines 36–39.

19. See the Court's discussion *supra* concerning the foreign applications which are identical counterparts to the '563 Bongard patent.